## Commonwealth, Appellant, *v.* Samuels.

Argued April 19, 1954. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT and ERVIN, JJ.

*Harry A. Estep,* with him *Charles D. Coll,* Special Deputy Attorneys General and *Frank F. Truscott,* Attorney General, for appellant.

*A. C. Hepps,* for appellees.

OPINION BY ROSS, J., July 13, 1954:

The defendants were brought to trial in the Court of Quarter Sessions in and for Allegheny County under several indictments charging them with conspiracy and fraudulent conversion. At the conclusion of the Commonwealth's case the court below sustained defendants' demurrer. The Commonwealth has appealed to this Court.

The funds with respect to which the defendants are alleged to have conspired and which they are charged with converting arose under the Act of June 28, 1895, P. L. 408, as amended, 72 PS sec. 2262. Under the provisions of the Act as amended, all the tax received from foreign fire insurance companies doing business within the cities, boroughs, towns and townships of the Commonwealth is paid to the treasurers of the several municipalities. It is provided: "Each city,

borough, town or township, receiving any payment from the State Treasurer hereunder, shall forthwith pay the amount received to the relief fund association of, or the pension fund covering the employes of the fire department . . . paid or volunteer . . . as is or are engaged in the service of such city, borough, town, or township, and duly recognized as such by the council or commissioners or supervisors, as the case may be, of such city, borough, town, or township."

On or about March 1, 1898, a charter was issued to an organization designated as the "Homestead Fireman's Relief Association". The charter provides: "That said corporation is formed for the purpose of providing for and maintaining a fund for legacies, bequests, and other sources for the relief and the support and burial of its members who may be crippled or killed, or who may be prevented from attending to their usual occupation or calling on account of chronic ailment or permanent injuries caused by exposure or accident during the discharge of their duties as firemen, and for the pensioning of widows and orphans, or dependent parents of members who may be killed, or who may die from injury received while in the discharge of their duties as firemen, and for such expenses necessary for the maintenance of this Association."

On November 28, 1934, council of the Borough of Homestead passed a resolution in the following terms: "Resolved that the Town Council of the Borough of Homestead, Commonwealth of Pennsylvania, recognize the Homestead Volunteer Fireman's Relief Association of the Borough of Homestead and in pursuance to the Act of April 25, 1929, P. L. 709, and the amendments thereto, authorize the payment of the tax therein mentioned by the Treasurer of the Borough of Homestead, Pennsylvania, to the Homestead Fireman's Relief Association of the Homestead Fire Company; the above

company being the company which affords fire protection to the inhabitants of the Borough of Homestead."

The Commonwealth proved that from October 22, 1945 through April 3, 1952 ten checks were drawn by the State Treasurer on the Fire Insurance Tax Fund to the order of the treasurer of the Borough of Homestead, the total amount of said checks being $18,997.99. Most of these checks were deposited by the treasurer of the borough in the borough bank account. Thereafter the treasurer drew checks on the borough account and these checks were delivered by the borough secretary to the "Chief of the Fire Department", the defendant Herman Samuels. The oral testimony of the treasurer and the secretary is confused with respect to the payee of the several checks drawn on the borough account and delivered to the defendant Samuels. At one point the payee is said to be "the Homestead Fire Department", at another, the "Fireman's Relief Association", and at still another, "Homestead Fireman's Relief Association". The Commonwealth in its brief states that the borough drew seven checks payable to the "Homestead Fireman's Relief Association" and informs us that the total sum so paid was $13,165.06. One check, dated July 25, 1951, in the sum of $71.82, was endorsed "John J. Casey, Treas. Borough of Homestead —Payable to Homestead Firemens Relief Association of Homestead, Allegheny County, Pa., Herman Samuels". Another check, dated April 3, 1952, in the sum of $2,413.26, was endorsed "John J. Casey, Treas., Borough of Homestead, Herman Samuels, William H. Walton, Sec., and Michael F. Mulhern, Treasurer". The record does not disclose what became of the difference between the amount received by the borough from the Fire Insurance Tax Fund and the amount allegedly turned over by the borough to its firemen, a difference amounting to approximately $3,300.00.

Thus, if we accept the Commonwealth's version of what it proved, it would appear that the borough paid over by its own checks the sum of $13,165.06 to the "Homestead Firemen's Relief Association". It transferred by endorsement the sum of $71.82 to "Homestead Firemens Relief Association of Homestead", and also by endorsement the sum of $2,413.26 to "Herman Samuels, William H. Walton, Sec., and Michael F. Mulhern, Treasurer". The inquiry then is what happened to *this* sum of $15,650.15. To show that part of it was converted by the defendants the Commonwealth called George K. Latimer, an employe of Peoples First National Bank & Trust Company, successor to the Monongahela Trust Company. The record does not disclose what position Mr. Latimer held with Peoples.

Because the Commonwealth's case stands or falls on the testimony of this witness, we have reviewed it with painstaking care. It may be summarized as follows: Peoples First National Bank and Trust Company took over the Monongahela Trust Company in December of 1947. Mr. Latimer testified that he had "gone through" the records of Monongahela when Peoples took over and had found, among other things, a signature card produced at the trial. The "name of the account" to which this card related was "Fireman's Relief Association, Homestead, Pa." The signatures on the card were "Michale [Michael?] Mulhern, Treasurer; Herman Samuels, President; William H. Walton, Secretary". There was another and "separate" account at the bank called "Homestead Fireman's Relief Association". The Commonwealth introduced a check drawn against this latter account dated December 30, 1946, signed "Homestead Fireman's Relief Association, Thomas Dixon, President, and John A. Hickey, Treasurer". The following testimony appears in the cross-examination of Mr. Latimer: "Q. Well, do you have a card for Home-

stead Fireman's Relief Association, on which card appears the signature of Thomas J. Dixon, President, and John A. Hickey, Treasurer? A. No, I don't have it here. Q. But you did have an account? A. We have an account— Q. At that time? A. That's right."

On this state of the record it would appear that there were two separate organizations, Fireman's Relief Association and Homestead Fireman's Relief Association. The defendants Samuels, Mulhern and Walton were officers of Fireman's Relief Association only. Thomas Dixon and John A. Hickey, who are in no way implicated in this prosecution, were two (or all) of the officers of Homestead Fireman's Relief Association. Among the many checks introduced by the Commonwealth as exhibits were, in the words of the Commonwealth, "five checks drawn on the Monongahela Trust Company and signed by Mulhern, Samuels and Walton for *Homestead Fireman's Relief Association*". And, at another point in the record, counsel for the Commonwealth, in describing an exhibit he wished to introduce, stated: "Now, I show you Exhibit 15, two checks drawn to P. J. Hughes, one in the sum of $6.00 dated May 22, 1946, and one in the sum of $75.00 dated October 31, 1945, and drawn to the account of the *Homestead Fireman's Relief Association* and signed by Samuels, Walton and Mulhern." Another check was described by counsel for the Commonwealth as a check "dated October 23, 1947, payable to Herman Samuels, $100.00, and signed by the *Homestead Relief Association* and its officers . . ." To add to the confusion the balance of the checks introduced by the Commonwealth were signed by Samuels, Mulhern and Walton for Fireman's Relief Association *of Homestead,* there being, so far as this record is concerned, no such account in the bank.

Those checks above adverted to—the ones signed by Samuels, Mulhern and Walton as officers of Fireman's Relief Association of Homestead and, presumably, debited against the account "Fireman's Relief Association, Homestead, Pa."—were drawn to the order of merchants, individuals other than the defendants, and to the defendants.

With respect to deposits and withdrawals from the "Homestead Fireman's Relief Association" account the Commonwealth showed that there was a balance at the "end of January 1945" of $1,313.03, that there were deposits of $3,322.82 during 1945, that there was a deposit of $1,201.44 in that account on October 30, 1945, and that the sum of $1,201.44 "was drawn from this account, the Homestead Fireman's Relief Association, on November 1st (1945), and credited to the Fireman's Relief Association, on November 1st . . . the same day". The only other evidence concerning what was, or is now, in the two accounts under consideration is that a check in the sum of $360.47, "signed Homestead Fireman's Relief Association, Thomas Dixon, President, and John A. Hickey, Treasurer", dated December 30, 1946, "took all of the money out of the account as of the date it was drawn". There is not one word of testimony with respect to what balance was, or is now, in the Fireman's Relief Association, Homestead, Pa. account.

The Commonwealth, after having rested, was permitted to reopen its case to "prove by a witness that these men [the defendants] were firemen of the Borough of Homestead, and as they got these checks from the Fireman's Association that they, by inference, were members of the Association". The Commonwealth then proceeded to recall the borough secretary. He identified the defendants (with the exception of Sweeney, Cush, Leach and Scuffle) as having been members of the

Fire Department of Homestead "since 1945". The witness testified that as to Sweeney, he did not know how long he had been a fireman; as to Cush, he did not think he had been a fireman since 1945; as to Leach, he again did not know how long he had been a fireman; and as to Scuffle, who had worked at other jobs for the borough, the witness could not say when he had or had not been a fireman.

It is the contention of the Commonwealth that "when the Borough transmitted the funds to the Homestead Fireman's Relief Association, in the sum of $15,650.15, between October 26, 1945 to July 25, 1950 . . . the said funds were to be used by the said Association in accordance with its purpose as set forth in its Charter. And, if it distributes the funds not in accordance with the purposes as set forth in its Charter, then that money should have been returned to the Commonwealth." The Commonwealth states further: "It is clear from the evidence that the funds were not used to provide the relief designated in accordance with the purpose of the Association's existence; and failing to use the funds thus was a violation of the law." There are several fallacies in these arguments.

First, the Commonwealth has failed to show that any part of the money transferred by the borough to the firemen was spent at all, let alone improperly. It showed what it deemed improper disbursements from a bank account designated "Fireman's Relief Association". It may well be that the money disbursed was money received from the borough, but it may as easily be true that the money was derived from another source and that the funds derived from the Fire Insurance Tax Fund are undistributed. There is here no evidence that the State made any attempt to conduct an audit of the finances of the relief association in Homestead, whatever the name of that association may be. A

further difficulty with the Commonwealth's position is that it relies heavily upon the charter issued to a "Homestead Fireman's Relief Association" and the purposes of that organization as set forth in said charter, to show that the members of an organization called "Fireman's Relief Association" acted improperly. Again these two organizations may, as the Commonwealth contends, be identical, but the Commonwealth failed to prove it. On the contrary, the evidence that there was a bank account in each name gives rise to the inference that there were two different associations. Further doubt is cast upon the theory that the two associations were identical by the fact that each appeared at the same time to have different officers. The evidence falls far short of establishing that these defendants were members of the "Homestead Fireman's Relief Association" and thus bound by the provisions of a charter issued to that organization.

This case is not the same as *Commonwealth v. Souder*, 172 Pa. Superior Ct. 463, 94 A. 2d 136, affirmed 376 Pa. 78, 101 A. 2d 693, wherein we reversed the trial court which had granted defendants' motion in arrest of judgment. In that case the Commonwealth established that the tax money received from the State was turned over to the defendants, all *officers* in the McKees Rocks Firemen's Protective Association, and that this money was deposited in the association bank account. An audit disclosed that there was later nothing in that bank account and that the defendant officers of the association did not have cancelled checks for the sums drawn against the account. This evidence is to be contrasted with that presented by the Commonwealth in the case at bar. Here there was no evidence to indicate where the tax money had gone after it was turned over to the association, there was no evidence to indicate that the money was not still on deposit in the

Peoples Bank or in some other depository, and the Commonwealth had in its possession all of the cancelled checks. Here too the resolution of the Borough of Homestead simply recognized the "Homestead Fireman's Relief Association" as the proper recipient of the tax money without setting forth any purpose for which the money had to be used.

The most significant distinction between the present case and the *Souder* case is that here we can find no circumstance from which a criminal intent can be implied. In the *Souder* case we stated at page 471: "The willful and total destruction of all records of the association is a 'circumstance from which a fraudulent conversion may be inferred' and a criminal 'intent . . . implied.' " In the case at bar, so far as appears, the records of the association were available to the Commonwealth. Further, the defendants in the *Souder* case, by virtue of the resolution which enabled them to receive the tax money, were aware of the purposes to which it could be devoted. Here there is no such notice unless it is the charter of an organization with which the Commonwealth failed to connect these defendants. In a case such as the present one, the question is not whether the defendants had the right to withhold or devote the tax funds to their own use, but rather whether they in good faith believed they had such right. They are guilty of fraudulent conversion only if at the time they received and retained the money they knew they were not entitled to it. Cf. *Com. v. Wiener*, 340 Pa. 369, 375-376, 17 A. 2d 357.

The charges of conspiracy must fall with those of fraudulent conversion.

The orders of the court below are affirmed.