## Commonwealth v. Kauffman

*Jack M. Myers,* Assistant District Attorney, for Commonwealth.

*Donald M. Bowman,* for defendant.

ULLMAN, J., September 9, 1960.—This matter was previously before the Superior Court as of 190 Pa. Superior Ct. 444, and no useful purpose would be served by here repeating what was there clearly and lucidly said. Defendant, Joseph Kauffman, had been tried in the Municipal Court of Philadelphia before a judge sitting without a jury and convicted upon the same five bills of indictment, each charging him with

embezzlement. After considering the various contentions raised by appellant, the court, speaking through President Judge Rhodes, said at page 454:

"Unfortunately the trial court appears to have oversimplified the issue; consequently, it did not direct its inquiry to a full determination of the nature and extent of the relationship between the company and defendant or of his authority respecting funds of the company as that authority may have been established explicitly, tacitly, or by a course of conduct. In the course of the trial the court declared its interest in only one issue, — 'a simple issue; and that issue is whether the customers had paid money over to Mr. Kauffman that he has not turned in to this company.' While some latitude was allowed defendant in presenting his case, the court obviously was of the impression that these efforts were but 'labored attempts . . . to becloud the issue.' In the interest of justice, the case must be retried so that the facts may be fully presented and the issues fairly determined."

The case again came on for trial in quarter sessions court and was tried before a jury on December 15-17, 1959, the jury bringing in a verdict of guilty on all bills. A motion for new trial was made, and after a considerable lapse of time, Irving Shull, Esq., who had originally tried the case and argued the appeal before the Superior Court and again tried it in the instant case, withdrew and was replaced by defendant's present counsel, Donald M. Bowman, Esq., who filed a number of additional reasons in support of the motion for new trial and a motion in arrest of judgment. These motions were subsequently argued before the trial judge who, after careful consideration of the oral arguments and the briefs, and after requesting supplemental briefs on one point, dismissed both motions and sentenced defendant to a term of not less than two nor more than four years in Eastern State Penitentiary.

From this sentence defendant has filed the instant appeal.

At the time of the new trial the testimony of the witnesses, the speeches of counsel and the charge of the trial judge were primarily directed at resolving the issues to explore which the Superior Court had directed a new trial.

Albert E. Miller, who was president of M. Jennings & Sons, Kauffman's employer, was the principal witness for the Commonwealth. He testified at great length, and in accordance with the Superior Court's injunction, defendant's counsel was given great latitude in cross-examination. His evidence was substantially the same, though more detailed than that given at the first trial and offered into evidence 11 exhibits, including all the original records of the company dealing with Kauffman's withdrawals and expenses. The Commonwealth also called a new witness, Mary Antoninich, who testified through the chief official court interpreter, Thomas A. Del Vecchio, and whose testimony, if credited by the jury, may well have had a devastating effect upon their opinion as to defendant's credibility.

Defendant himself was his principal witness and he also testified at great length under both direct and cross-examination substantially as he had testified at the time of the first trial, but again in greater detail and offered 19 exhibits in a group and a limited offer of two additional ones, which are part of the record. The only other witness produced by defendant was Robert J. Hanlon, a fellow employe, whose testimony seemed to the trial judge more remarkable for what he did not say than for what he did testify to. Defendant's parents, who are alive and live in Philadelphia and whose testimony might well have been pertinent

as to the bitterly disputed judgment note, were not called by either side.

It is clear from the record that Kauffman's financial obligations to M. Jennings & Sons (hereinafter for the sake of brevity referred to as "the company") were not confined to the original contract of employment and its supplement. The original contract of employment was executed on January 1, 1954, and apparently carefully gone over by defendant, for there are a number of changes initialed by him. Subsequently, a supplemental contract was entered into, changing certain parts and deleting other parts of the original contract. Both were offered in evidence, but no useful purpose would be served by discussing them since the provisions and the alterations are not materially relevant to any issue now before the court.

It is important, however, that, at the time the employment began, Kauffman was then engaged in another operation which he had previously begun on his own in Hammonton, N. J. Miller testified, and Kauffman never denied, that Kauffman was then working on this job but did not have the money to complete it and that Kauffman and the company therefore entered into a contract whereby the company was to supply material at cost plus 10 percent. It would seem clear that Kauffman's indebtedness on the Hammonton job was never fully paid for in cash and that the unpaid balance of this enters into the two judgment notes given to the company and the statement of July 31, 1954, signed and initialed by Kauffman showing that, as of that date, Kauffman was indebted to the company in the sum of $1523.75. This analysis of the financial dealings between the company and defendant was sent by the company to defendant, signed by him, and returned. Defendant also prepared a statement of his own which showed him indebted in a lesser amount, but nonetheless indebted, to the company.

Prior to that, in March of 1954, defendant, Kauffman, had given the company a judgment note in the sum of $1,016.12 on which defendant had paid on account $15 a week from March to July.

There also entered into the picture at least one cash loan to defendant by the company in the sum of $200 made on February 18, 1954. According to Miller's testimony, there were a number of other loans, for when defendant produced a batch of checks drawn by him to the company, while cross-examining Miller, he testified that those checks were not given to the company in payment of money which Kauffman had collected from customers, but that they were checks that were cashed by Kauffman in the office, or repayment of temporary borrowings. Miller testified, and Kauffman did not deny, that defendant frequently cashed checks at the office of the company by drawing checks to the company and getting cash for them.

These transactions were, of course, entirely apart from the four customer transactions which gave rise to the bills of indictment upon which defendant was tried and which were analyzed by the Superior Court in its opinion at page 447. In cross-examining Miller as to the Barrish transaction, it developed that there was another transaction, not referred to by the Superior Court in its opinion, where, if the Commonwealth's witnesses are to be believed, there was another embezzlement of $430 from a customer named Mary Antoninich. The testimony as to this transaction and Kauffman's attempts to explain it may very possibly have been most damaging to Kauffman's credibility in the eyes of the jury.

Under cross-examination, Mr. Miller was shown a check, identified as defendant's exhibit 2, drawn by Kauffman to the company and dated October 6, 1954, in the sum of $430. Miller was then asked whether that

check was given in payment of the money collected on the Barrish accounts, the subject matter of bills of indictment 8 and 9. Miller replied that that was in payment of moneys that defendant had collected from Mrs. Antoninich in August of 1954 and was sent to the company with a letter by Kauffman so stating.

When defendant took the stand on his own behalf, he testified that he did not sell the Antoninich contract, did not collect any money on it, but had written a letter to Miller enclosing the check from him for $430 in anticipation that the money would be turned over to him by a salesman named Nicastro and that when he left the company's office he left that letter in his desk and that was all he knew about it. This story has certain inherent implausibilities. But in addition to that, Mrs. Antoninich was called by the Commonwealth in rebuttal. She testified that defendant got the contract, collected a down deposit of $30 from her, and when the job was completed came to her house, brought her to a bank at Fifth and Bainbridge where she withdrew four one-hundred-dollar bills and that she was positive she gave this money to defendant "personally in his hands". Under cross-examination she repeated her statement with emphasis that it was defendant with whom she dealt and that it was he to whom she had paid $430 in full payment for the job.

Defendant's attention was called by the Commonwealth to the fact that at the hearing on the first trial he had testified that Mrs. Antoninich did pay him the money, that he took her to the Fifth and Bainbridge branch of the Pennsylvania Company where she had a savings account and where she secured a cashier's check payable directly to the order of M. Jennings & Sons for the sum of $430. Kauffman then repudiated the testimony he had given at the first trial and said that there had been two letters, one forwarding the

cashier's check and the other the one that was produced with the check on October 6, 1954.

A judgment note was given to the company signed by Kauffman and his parents, bearing date October 1, 1954, and which was subsequently entered of record as of Court of Common Pleas No. 5, March term 1955, no. 8840. The court, on its own instance, sent to the prothonotary's office and had the original note brought over. Defendant testified under direct examination first that he turned it over to Miller on or about October 1st and then corrected that and said it was some time in the Spring of 1954, six months before the date the note bears and seven months before the dates of two letters which were marked by defendant as exhibits 16 and 17 and referred to several times in the testimony, but which apparently, as will hereinafter be discussed, were never offered in evidence.

It is Kauffman's story that this judgment note was signed by himself and his parents in blank and then delivered to Miller as payment for $175 due the company on a water heater that had been installed in the parents' home and that Miller fraudulently filled in this note for the rather uneven sum of $2,983.80 and threatened Kauffman that he would issue execution on the note against his parents and, because of the fear and confusion into which this threat put defendant, he gave the company the various bad checks detailed at page 447 of the Superior Court's opinion and that he did this although in fact he owed the company nothing. He also testified that he gave these bad checks hoping to placate Miller and induce him to come to a full accounting and pay defendant what was due him.

It is worthy of note that no judgment was entered on this note until March of the following year, although it could have been entered earlier. It is further worthy of note that neither Kauffman nor his parents,

up to the present time, have ever sought to open up that judgment, nor for that matter has the company ever sought to issue execution on it.

Miller wrote two letters to defendant's parents, who were never called as witnesses by either side, one dated October 30th, which was marked "D-16", and one dated November 5, 1954, marked "D-17". They were handed to the district attorney to read and to the court to read and were used in redirect examination of defendant, but for some reason were never offered in evidence by defendant and, instead, two other papers substituted as "D-16" and "D-17". The court was never advised of this fact and had no knowledge of it until after he had completed his charge, when he was so informed by defendant's counsel. The court thereupon charged the jury to disregard the letters and any comment on them and any inferences that might flow from them and to simply expunge those letters from their minds. At the close of the conference at which the court was advised that these letters, though identified and referred to by defendant, had not been offered in evidence, defendant's counsel suggested that he offer them "just for the purpose of the record and not to be sent out".

As to this judgment note, Miller was called for redirect testimony and he testified that defendant had given the company a judgment note of his own in another amount which was presumably the note of $1,016.12 given in March and that when Kauffman did not keep up the payments and the amount that defendant owed the company got still larger, he asked for further security; that at that time there was a balance of $100 owed by defendant's parents for the installation of the heater and that that was incorporated in the total amount of the judgment note, which Kauffman had his parents sign and brought in signed

in blank, as collateral security for the moneys owed the company by defendant. The receipts reducing the balance to $100 were offered in evidence by the Commonwealth. The exhibits "D-16" and "D-17", heretofore referred to, that were identified and used but not formally offered, and which were made part of the record by defendant's counsel and are now before the Superior Court, advised Kauffman's parents that this note was to pay off the balance owed by defendant, and if they had not authorized their signatures for that purpose, to so advise the company. While it is debatable whether the contents of these letters are properly in evidence, the fact that two letters were written by the company to Kauffman's parents in October and November of 1954 is established by the record, which, it would seem, would be strange conduct on the part of a man who had fraudulently filled out a note intended to be in payment of a balance of $100, or at most $175, so that it became a note for $2,893.80.

The only other witness called was Robert John Hanlon, who was called by defendant and testified briefly that he was a coemploye with defendant of the company in 1954 and that Kauffman came to work early in the morning, sat at a desk where they took service messages, then sent the men out on oil hauls and coal hauls and that in the absence of Mr. Miller, defendant, to the best of his knowledge, was more or less in charge.

Miller had testified that on two of the four customer transactions covered by the indictments in the present case the work had actually been done by Hanlon and his assistants and that those were the Fiorvanti and Hoptroff jobs and that Hanlon and his assistants were on the payroll of the company and paid by the hour on these jobs and that there were no subcontractors. When Hanlon was called as a witness, he was asked nothing about this testimony.

The balance of the testimony was a direct conflict between Miller and Kauffman as to whether Kauffman had any authority to pay any subcontractors or lay out any other moneys for the company. Miller testified unequivocally that he did not have such authority and that there was no need for it. Kauffman testified equally unequivocally that Miller ducked paying the subcontractors and that since he employed them he felt responsible for their being paid and he paid them. Kauffman produced a number of checks made out by him to various people who had had business relations with defendant. Most of these checks were for small amounts. Defendant testified they were all paid for the benefit of the company and he was never reimbursed for them. A number of these checks, however, it was developed under cross-examination, were endorsed by the payee and reëndorsed by defendant. At least one was marked as a loan. Another was endorsed by the payee, "Pay to the order of Joseph Kauffman". This was apparently true of a number of the checks, but not all of them. Other checks were marked for deposit to M. Jennings & Sons. In brief, it is a tangled picture and it may well be that what weight the jury gave to these various checks depended upon what estimate they made of defendant's credibility.

On the motion for new trial, a large number of reasons were assigned and argued and the court is advised by defendant's counsel that they will be the same points that will be argued before the Superior Court. A number of them can be disposed of quite briefly.

In the first place, able counsel for defendant argued that these indictments were barred by the statute of limitations. This point was argued before the Superior Court on the first appeal and found to be without merit.

In the second place, it was argued that the verdict is against the weight of the evidence, and in this argument particular stress is laid upon the fact that the two judgment notes, one executed in March 1954, by defendant in the sum of $1,016.12 and the other dated October 1, 1954, in the sum of $2,983.80, total very close to $4,000; that defendant's total drawings were substantially less than that and that it was impossible for defendant to owe the company that much money.

There are a number of fallacies in this argument. In the first place, the two notes are not cumulative, but as clearly appears from the record, the second and larger note covered the same items for which the first note was given. In the second place, these notes by no means dealt only with defendant's drawings. There is no doubt but that Kauffman's drawings were against commissions to be earned, and if he did not earn his drawings, he owed that to the company. But, in addition to that, there is the unpaid balance on the Hammonton job, there is the cash advance in February 1954, there are the moneys embezzled in the four customer transactions presently before the court, and in addition, at least the money which the company did not receive but which was paid by Mary Antoninich. The judgment note dated October 1, 1954, also included the balance owed by Kauffman's parents. It is evident, therefore, that it was made up of a number of disparate elements and not merely a question of overdrawing.

Defendant's counsel lays a great deal of stress on the fact that Miller was said by Kauffman to be a certified public accountant and, since no denial was made, it may be assumed that it was probably true. Miller, however, at that trial produced the original papers showing Kauffman's drawings and debits, which were offered in evidence and made available for

defendant and his counsel to examine. He brought with him several brief cases stuffed with papers which were referred to frequently throughout the trial. No other papers were subpoenaed by defendant and, in fact, no other papers were at any time requested by defendant.

It is also argued that Mary Antoninich's testimony was improperly admitted and should not be considered in weighing the testimony. For reasons that will hereinafter be set forth, the court believes this contention is without merit.

In the opinion of the court, the case was clearly one for the jury. The jury could accept or reject the testimony of any witness in whole or in part, for the credibility of witnesses is always for the jury: Juchniewicz v. Hawthorne, 158 Pa. Superior Ct. 146, and cases therein cited at pages 149, 150.

It has been repeatedly held by the appellate courts after a conviction, in considering whether the evidence is sufficient to support the verdict, that the testimony must be considered in the light most favorable to the Commonwealth: Commonwealth v. Stone, 187 Pa. Superior Ct. 225, 227 (1958) ; Commonwealth v. Mitchell, 181 Pa. Superior Court 225, 227 (1956) ; Commonwealth v. Ricci, 177 Pa. Superior Ct. 556, 564 (1955) ; Commonwealth v. Lowry, 374 Pa. 594, 597, (1953), and cases therein cited.

The third point argued by defendant is that the record does not establish that the official court interpreter who interpreted for Mary Antoninich was himself sworn. There are a number of answers to this contention. The record simply shows:

". . . MARY ANTONINICH, sworn, and testified through the official Italian interpreter, as follows. . . ."

The interpreter in question was Thomas A. Del Vecchio, chief official interpreter of the Courts of Common

Pleas and Quarter Sessions, with an office at 631 City Hall. He has been an official court interpreter for over 40 years, appointed under the Act of May 8, 1913, P. L. 170, and sworn under the Act of July 7, 1919, P. L. 725, 17 PS §1875. Before he assumes discharge of his duties, he must be sworn as a court official. Why should he be again sworn each time he enters upon the discharge of his duties any more than any other court officer? Certain it is that Mr. Del Vecchio has been in the courts for many, many years, that he has served as an official interpreter on countless occasions and that the court knows of no occasion when he has been required to be sworn.

In 2 Henry Pa. Evid. 4th Ed., §739, it is stated:

". . . it would seem that where he [the official interpreter] has taken the oath prescribed by the act, it is not necessary that he be sworn in each case in which he is called to testify."

It may also be pointed out that, when Mrs. Antoninich was sworn, no objection was made by defendant's counsel to the fact that Mr. Del Vecchio had not been sworn. Had objection been made and had the court considered it to have merit, Mr. Del Vecchio could have promptly been sworn and all controversy eliminated. In Commonwealth v. Diaco, 268 Pa. 305, 306 (1920), a first degree murder case, it was held that a substantially similar exception taken by defendant to the use of an Italian interpreter was without merit. See Underhill's Criminal Evidence, 4th ed., section 406, at page 828. In 23 C. J. S., Criminal Law, §965, at page 291, it is stated that, while interpreters generally should be sworn to interpret truly, where a sworn officer of a trial court acts as an interpreter, he need not be specially sworn every time that he acts.

It may also be noted in passing that defendant's counsel availed himself of Mr. Del Vecchio's services

in the cross-examination of Mrs. Antoninich, which was considerably longer than the direct examination.

Defendant next assigns as error rulings on evidence on the part of the court. The first relates to an answer given by Miller at page 18 of the notes of testimony which was objected to as being devious. The court was not of the opinion that the objection was well taken then and is still of the same opinion, and it would seem to be clearly de minimis.

The second assignment of error alleged in ruling on the testimony is that the court refused to allow defendant's counsel to ask Miller under cross-examination whether, out of $25,000 gross receipts on 40 contracts, defendant had paid $24,000. An objection was sustained on the ground that it was not proper cross-examination, since no such matter had been touched upon in direct. Defendant's counsel frankly stated it would become material when the defense was presented. Counsel cannot develop a defense under the guise of cross-examination, nor does the court, now that the defense is known to him, see how it would have been of any materiality.

The next error assigned by defendant is that the court in his charge commented to the jury on two letters written to defendant's parents and sent by registered mail regarding the judgment note dated October 1, 1954. As has been previously pointed out, they were handed to the district attorney and to the court to be read and were marked "D-16" and "D-17". At the close of defendant's case, defendant's counsel merely stated:

"Sir, I offer into evidence Defendant's Exhibits 1-19, inclusive."

The court's attention was not called to the fact that other papers had been substituted for the papers shown to him and marked by defendant "D-16" and

"D-17". The court is not for a moment implying that defendant's counsel intended to deceive the court; however, it is stating that defendant's counsel should have called to the court's attention the fact that D-16 and D-17 were not being offered by him and that in lieu thereof two other exhibits were so marked.

Apparently defendant's counsel had had them marked for identification before he read them and then repented of having done so, without so advising the court. He then stated:

"MR. SHULL: I would suggest that I offer them just for the purpose of the record and not to be sent out."

Immediately thereafter, the court called the jury's attention to these two letters and that subsequently these letters, which had been marked as "Defendant's Exhibits 16 and 17" were not offered in evidence, and charged the jury:

"I was completely unaware of that when I made my charge, that some other papers had taken their place as D-16 and D-17, and I therefore now tell you to disregard these letters and my comment on them and any inferences that may flow from them to the best of your ability. Simply expunge from your mind those letters and any inferences because, while I honestly thought they had been offered and they were handed to me to be read for the purpose of being offered, subsequently they were not offered."

If there were error, it is believed that it was corrected by the court's correction of its charge, to which no exception was taken.

Finally, defendant's counsel takes a number of exceptions to the charge of the court. The first one is that the court's charge was "slanted" in that it unduly emphasized the Commonwealth's case and minimized defendant's. It is sufficient to state that we have carefully reviewed the charge and are satisfied that it

fairly presented the issues to the jury for resolution of the factual and legal questions presented by the evidence. The only exception of that type taken by defendant's counsel was to call the court's attention to the fact that he had commented on the fact that no attempt was made to open the judgment on the note of October 1st and requested the court to call to the jury's attention that it was equally true that no execution had been issued on the judgment. This the court did, and at no time did defendant's counsel, prior to the motion for new trial, make any suggestion that the charge was slanted or take any exception to it on that ground.

Exception is also taken to the fact that the court commented in his charge on the testimony of Mrs. Antoninich. The exception is based solely on the ground that Mr. Del Vecchio may not have been sworn. That issue has been already sufficiently covered.

Finally, objection is taken to the language used by the court in its charge in defining embezzlement.

The court first read the jury the statutory definition of embezzlement in its entirety. The court then said:

"Now, let me see if I can't trim that down for you as it applies to the facts of a case like this to make it a little simpler. Whoever, being an employee or agent of any corporation, fraudulently takes and applies to his own use, for himself or any other person who is not entitled to it, any of the money of that corporation, is guilty of embezzlement.

"The heart of the offense is the withholding of the property of another with intent to defraud him or to deprive him of the use and the benefit of that property and to turn it and apply it to the defendant's own use or benefit. Now, did the defendant do that?

"The defendant claims, and his counsel argued to you very ably, that the funds used by him were used by him in the course of the company's business to pay subcontractors, although not necessarily the subcontractors who were involved in these four renovation jobs, or other contractors of the company. He claims that he paid not only that, but a lot more for that purpose."

The court then charged the jury:

"Before he would be entitled to be acquitted on the claim of right, both of those things must be there: first, a bona fide, which means an honest, true, sincere belief that this employer, Jennings, owed him the money; and, secondly, and at the same time, an honest, sincere, real belief that he had, either by expressed consent or by implied consent or by the custom of the company the right to take this money, put it in his pocket and apply it to the indebtedness which the company owed him.

"If, in your opinion, he honestly, sincerely, really did believe both of those things and acted on that belief, then, even if he was wrong, he is entitled to be acquitted because he did not have a criminal mind, a criminal intent. But if, in your opinion, either he did not honestly, sincerely, bona fide, genuinely believe that there was a debt which the company owed him, or even if he believed there was such a debt, if he did not honestly, sincerely, genuinely believe that he had some kind of authorization from the company to take this money and put it in his own pocket and apply it to the debt instead of turning it into the company treasury, if either one of these two is lacking, then I charge you that the defense of acting under a claim of right falls."

After briefly reviewing the evidence the court again charged the jury.

"All of these things are of importance for just one reason, and that is as they bear on the issue: do you believe that Kauffman genuinely, honestly, sincerely in his heart believed that Jennings owed him either $8,560 or any other substantial sum of money? Or, on the other hand, do you believe that that is a fabrication invented by him as a defense in this case? That is for you to decide—or whether you feel it is part one and part the other. It is solely a question of fact as to what you think was in the man's mind and heart.

"In the second place, we come to another question: did Kauflman honestly, genuinely, sincerely believe that he had authority, either by word of mouth or by written contract, or by the course of business or by what is called in law 'implicit authority,' properly inferred from what went on, to take the money of the four people who are covered by these bills, Fioravanti, Barrish, Hoptroff, and Brenner, and which was without dispute paid to him for the purpose of being in turn paid over to Jennings—did he honestly and in his heart sincerely believe that he had the right to take that money and put it in his own pocket to apply against the obligation that Jennings owed him? If you first find that he honestly, even if mistakenly, really believed that Jennings was indebted to him rather than he to Jennings, if you find both of those facts in favor of the defendant, if you find that there was a bona fide indebtedness of Jennings or even that Kauffman honestly believed there was, and if you also find that he had authority to take this money and put it in his own pocket on account of the indebtedness, or even if he didn't have it, if he honestly and in his heart and soul sincerely believed he had, if both of those things are present, then I charge you that your verdict should be for the defendant."

As has heretofore been pointed out, the evidence pro-

duced in the instant trial is substantially the same as that produced at the time of the first trial, though in much greater detail and with much wider latitude allowed defendant in cross-examination. There were also produced in the present trial a considerable number of exhibits including the books of original entry of the company, but basically and essentially the evidence was the same and the issues were the same.

When this case was before the Superior Court, the court said at page 451, 452:

"Defendant claimed, however, that the funds were used by him in the course of the company's business to pay subcontractors, though not necessarily those involved on the jobs concerned in these indictments, and other creditors of the company. The amounts alleged to have been so paid by defendant totaled approximately $1,700.

"Under the circumstances, the issue became whether defendant had fraudulently converted the funds collected or whether he had applied them in the course of the business under the belief that he was authorized to do so. It was a defense somewhat related to a claim of right, an assertion by the defendant that he withheld or used the funds in good faith believing that he had the right to do so. *Com. v. Samuels*, 175 Pa. Superior Ct. 506, 569, 107 A. 2d 357, *Com. v. Wiener*, 340 Pa. 369, 375, 17 A. 2d 357. The question is not simply whether defendant actually had such right or authority, but whether he held a bona fide belief in that respect. *Com. v. Meinhart*, 173 Pa. Superior Ct. 495, 500, 98 A. 2d 392; *Com. v. Samuels*, supra, 175 Pa. Superior Ct. 560, 569, 107 A. 2d 197. Of course, if the defendant did not have such belief but simply claimed the ability or intention to repay the funds, his actions would not be justified. *Commonwealth v. Bovaird*, 373 Pa. 47, 59, 95 A. 2d. 173."

The Superior Court then briefly reviewed the nature of the evidence produced at the first trial and then said at page 453:

"As the prosecuting witness denied that defendant had authority to remit funds to the company by his personal checks or to pay subcontractors and creditors of the company, the inquiry should naturally have turned to other evidence, such as the records of the company, to determine whether a course of conduct was established between the company and defendant demonstrative of this authority either explicit or implied.

"This aspect of the case was sufficiently important to warrant more endeavor toward certainty before conviction than mere acceptance of the general denial of the prosecuting witness. This is especially true in view of the documentary evidence introduced by defendant. Such would tend to establish his authority, or foundation for a reasonable belief that such authority existed, when coupled with his explanation and the important, though limited, concessions made by the prosecuting witness."

The Superior Court then granted a new trial, saying: "In the interest of justice, the case must be retried so that the facts may be fully presented and the issues fairly determined."

As has heretofore been pointed out, a very substantial number of exhibits were produced and offered in evidence, many of them multiple in nature. No other papers were attempted to be subpoened by defendant, nor were ever requested by defendant in the course of the trial. The company books of original entry were produced, offered in evidence and made available for examination by defendant's counsel. The position of defendant at the time of trial was, as stated by the court in the charge:

"The defendant claims, and his counsel argued to you very ably, that the funds used by him were used by him in the course of the company's business to pay subcontractors . . ."

No exception was taken to that part of the charge, nor did defendant's counsel request the court to state that the defendant's position was in any wise different.

In the brief filed by defendant's counsel on the motion for new trial, defendant's present counsel stated the issue on its first page of the brief in the following language:

"In essence, the defense offered by the defendant was that in his capacity as an employee for the prosecutor, he was authorized and did make payments to various sub-contractors and suppliers for the benefit of his employer, and that there were monies due him from these transactions for which he had not been reimbursed."

Defendant, in his direct testimony, at no time stated clearly or unequivocally that he kept the money which he collected on the various jobs in issue because he felt that it was his money to reimburse him for what he had laid out, or for commissions due and unpaid. Not only did he at no time claim that it was his money as of right, but his conduct is irreconcilable with that thesis, for out of a total of $1,810, collected by Kauffman on the four customer transactions which are the foundations of the present indictment, he gave the company at one time or another $600 in cash, and at other time $800 in bad checks and only $410 of this amount was retained by him and covered only by the judgment note. There was also, of course, the check for $430 on the Antoninich job which came into the company's possession. At pages 167 to 170 of the notes of testimony, he gave his explanation under cross-

examination as to why he did not turn all of the money over to Miller. It may perhaps be not too inaccurately summarized in a question asked defendant by the court at page 170:

"Q. Just a minute. Do I understand you correctly, sir, that you kept this money apart to pay bills and partly so you wouldn't be living on air?

"A. That is correct, Your Honor."

At no place anywhere in the record does defendant take the position that he believed this was his money and that he had a right to keep it.

It is argued by defendant's counsel that the court's charge placed an unduly great burden upon defendant and that the intent to defraud would be absent if he believed he had the right to keep the money. The court believes that its charge on this issue fully and adequately met the issue as to the defense raised by defendant and covered the issues which the Superior Court has specifically remanded the case to have clarified.

After this opinion had been dictated and in considerable part transcribed, defendant's counsel gave the court, on September 5th, a statement of the questions to be argued in the Superior Court under rule 22. The first and second of the questions contained in the statement require some comment. The second assigns error to the trial judge's charge in language which the trial judge did not use. This presumably is mere oversight.

The first statement of questions to be argued is that it was reversible error for the trial judge to fail to instruct the jury on the quantum of proof necessary to establish the affirmative defense that defendant withheld funds from his employer under a claim of right. In the first place, at no time did defendant re-

quest the trial judge to so charge the jury. Not having done so, it cannot be complained of for the first time on appeal: Commonwealth v. Russella, et al. 117 Pa. Superior Ct. 359, 364, 365 (1935) ; Shields v. Larry Construction Co., Inc., 370 Pa. 582, 588 (1952). In the second place, the question raised in the first statement of questions to be argued was at no time raised in the motion for new trial or in the motion for arrest of judgment, nor was it argued to the court nor covered in defendant's brief on these two motions. The law is clear and well settled that "the court below may not be charged with error where the matter complained of was not brought to its attention in the motion for a new trial. Commonwealth v. Neuman, 151 Pa. Superior Ct. 642, 30 A. 2d 698": Commonwealth v. DiCarlo, 174 Pa. Superior Ct. 611, 613.

This was not an easy case to try. Defendant's testimony at times had a certain chameleon-like quality. For example, the judgment note of $2,983.80 bore the date October 1, 1954. In one breath Kauffman testified that it was executed on the date it bore. A few minutes later he testified that it was executed the previous spring. The amount of money which Kauffman claimed the company had owed him varied widely almost from day to day and his explanation of the Antoninich money and of there being two letters to the company, one which he did send and one which he left in his desk, frankly was beyond the comprehension of the trial judge. Many of the checks which defendant produced and stated were paid to subcontractors of the company and on the company's behalf, when examined turned out to have been endorsed and cashed by Kauffman. The latitude of cross-examination allowed by the trial judge in accordance with what he understood to be the wish of the Superior Court led to the introduction of a considerable mass of detail. Nevertheless, the trial

remained within proper bounds, and the verdict of guilty brought in by the jury was, in the opinion of the court, an eminently proper one.